**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **RICHARD A. CHAPMAN,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**JO ANNE B. BARNHART, Commissioner of** )<br>**Social Security,** )<br>)<br>**Defendant.** ) | **Case No. 2:04cv0090**<br><br>**Judge Thomas A. Wiseman, Jr.** |

**MEMORANDUM OPINION**

Before the Court is Plaintiff Richard A. Chapman's motion for judgment on the administrative record (Doc. No.7), filed along with a supporting brief (Doc. No. 8), seeking reversal of the Commissioner's decision denying benefits. The Commissioner of Social Security ("Commissioner" or "Defendant") filed a response opposing Plaintiff's motion (Doc. No. 13).

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's decision is supported by substantial evidence in the record. Accordingly, Plaintiff's motion for judgment will be denied and the Commissioner's decision denying benefits will be affirmed.

**I.    INTRODUCTION**

Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner 's finding that Plaintiff was not disabled and denying his petition for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").

Plaintiff filed his current application for DIB and SSI on September 15, 1998 (Doc. No. 5, Attachment, Administrative Record ("AR") 101–04), alleging that he became disabled on June 26, 1998 due to high blood pressure, emphysema and chronic obstructive pulmonary disease, nerves/anxiety, colon problems, bilateral carpal tunnel, back pain and knee pain (AR 155–56, 193, 319).[1] Plaintiff's application was denied initially and upon reconsideration. (AR 81, 88.) Plaintiff requested and received a hearing. (AR 90.) The hearing was

---

[1]Plaintiff was previously found to be disabled due to substance addiction disorders, and was awarded benefits from June 1995 through December 1996. Benefits apparently ceased on January 1, 1997 as a result of a change in the regulations.

conducted on November 23, 1999 before Administrative Law Judge ("ALJ") Peter C. Edison in Cookeville, Tennessee. (See AR 23, 44, 46–62.) The ALJ issued a written decision denying Plaintiff's application on February 16, 2000. (AR 23–36.) The Appeals Council denied Plaintiff's request for review by letter dated July 29, 2004 (AR 4–6), thereby rendering the ALJ's decision the final decision of the Commissioner.[2]

This civil action was thereafter timely filed, and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.    FACTUAL BACKGROUND

Plaintiff's date of birth is April 11, 1962. He was 37 at the time of the administrative hearing and is classified as a younger individual. (AR 45.) He completed the ninth grade and has had no other training. (AR 45, 247.) His past relevant work includes that of garment cutter/spreader and construction laborer. (AR 46–47, 58–59, 159.) At the time of the hearing, Plaintiff did not have his own home and was living with "anybody that will let him stay." (AR 58.)

### A.    The Medical Evidence

#### (1)    Medical Evidence, June 1993 through 1997

Much of the medical evidence in the record substantially predates Plaintiff's alleged disability onset date and is of questionable relevance. It is nonetheless summarized below:

From June 1993 through December 1996, Plaintiff underwent arthroscopic knee surgery; was diagnosed with "multiple diverticulosis," which caused stomach pain and persistent diarrhea. He complained of severe headaches waking him up at night, and severe anxiety and nervousness after his wife left him in December 1994. (AR 199.) He had several bouts of chest pain and shortness of breath that were diagnosed as bronchitis and then asthmatic bronchitis; he has been instructed numerous times to quit smoking. (AR 200, 204–06.) Plaintiff was assessed physically and psychologically in relation to his ability to do work, and was found to meet listing 12.09, substance addiction disorders. (AR 338–39, 245.) The various assessments leading to the initial disability determination did not indicate that he was significantly limited physically. In fact, the results of his pulmonary function test ("PFT") were better than expected though his effort was considered

_____

[2]The Appeals Council found that Plaintiff's request for review was not timely, but that Plaintiff had "good reason for the delay." (AR 4.)

Case 2:04-cv-00090   Document 17   Filed 07/27/06   Page 2 of 21 PageID #: 11

poor. The pulmonologist to whom Plaintiff was referred, Dr. Jarvis, noted: "Mr. Chapman is eager to relate to me how severely SOB [short of breath] he is and how unable he is to work. However, I am quite surprised that his pulmonary function tests were significantly better than expected. I cannot help but wonder whether a good deal of his symptomology is in fact from secondary gain. His FEV1 of nearly 3 liters is certainly no way disabling." (AR 261.) Dr. Jarvis noted repeatedly that Plaintiff's only chance of getting better was to quit smoking, and he advised Plaintiff at length about quitting smoking. (AR 264–65.) Nonetheless, Plaintiff was instructed to avoid dusty and poorly ventilated areas that might exacerbate his chronic asthma and bronchitis. (AR 208–09, 267–70.)

On the Wechsler test, Plaintiff obtained a full-scale IQ score of 57, with verbal IQ score of 65 and performance IQ score of 53. He was under the influence of alcohol on the day of the exam, however, and the assessor noted that the IQ scores were not considered to be accurate as a result. She also noted that Plaintiff appeared to be functioning intellectually on a higher level than the tests indicate. (AR 222.)

Dr. Melvin Blevins' impression in August 1995 was chronic obstructive pulmonary disease ("COPD"), bronchial asthma, tobacco abuse, status post multiple injuries, musculoskeletal pain syndrome, anxiety, and hypertension. (AR 227.)

In October 1995, Plaintiff attempted suicide by cutting his wrists while drunk and in a "depressed rage." (AR 247–48.) His mother claimed he had been depressed since his divorce. He had also pulled a gun on his parents earlier the same evening. He was transferred to jail for his own and others' safety. (AR 248.)

Tests performed in December 1996 showed high cholesterol as well as high glucose levels. (AR 308.) A brain CT performed in June 1997 was normal. (AR 305.) A spinal x-ray performed in August 1997 to "rule out disc disease" was negative, showing only "slight relative disc space narrowing at L5-S1," which was considered a normal variation. (AR 303.)

### (2) Medical Evidence, May 1998 through November 1999

In May 1998, Plaintiff presented to ER with chest pain, smoking related. He was put on a 24-hour "Holter Monitor" and told to follow up with his primary care physician the next day. He was also instructed, again, to "STOP SMOKING." (AR 287.) The results of the Holter test were unremarkable. (AR 292–93.)

3

Lung x-ray was also unremarkable, showing mild hyperinflation.  (AR 295.)

In September 1998, Dr. Donald Arms performed a "[l]ate reconstruction of mallet finger using insertion of a pseudo tendon and tendon advancement into the bone of the dorsal base of the distal phalanx."  Plaintiff had originally treated the injury with splinting, which worked until he had a recurrent injury, after which Plaintiff opted for surgery.  (AR 297–98.)  On follow up, he was doing well as of October 6, 1998.  On October 14, he claimed to have fallen and was experiencing a lot of pain.  A prescription of Darvocet was called in for him.  Two days later, he called complaining his finger was still swollen and painful, and that Darvocet was not helping.  He requested a stronger prescription, so the doctor called in a prescription for Lortab 5 mg.  This was renewed on October 23.  (AR 334.)

Dr. Melvin Blevins performed a consultative examination on October 8, 1998.  Dr. Blevins noted Plaintiff's surgical history and significant injuries included a fall in 1983 with laceration of the fifth digit of the left hand; torn cartilage of the left knee in 1992 with arthroscopic surgery in September 1998; jammed fifth finger on his right hand, with surgical intervention; motor vehicle accident in 1997 with fracture to the sternum and head trauma.  (AR 318–19.)  Plaintiff complained of decreased night vision; emphysema, COPD and asthma with shortness of breath; hypertension; diverticulitis with polyps and diarrhea; pain in both knees; bilateral carpal tunnel syndrome with pain, stiffness, numbness and tingling in his hands; headaches; and depression and anxiety.  Plaintiff alleged that he had smoked two packs per day for 25 years until quitting in February 1998.  (As noted above, the record does not substantiate that he quit on that date.)  He also reported he had stopped drinking alcohol in 1995 and that he had a ninth grade education and some difficulty reading and writing.

Objective findings included "breath sounds moderately decreased with rhonchi and a few basilar rales" (AR 321); sinus tachycardia (AR 322); Heberden's nodes consistent with osteoarthritis but grossly normal spinal configuration; perilumbar tenderness.  (AR 322.)  The neurological exam was normal except grip was noted to be moderately decreased bilaterally.  The PFT indicated moderate obstruction (AR 328.)  The range of motion of his right fifth finger could not be assessed due to his recent surgery.  Elsewhere, range of motion was normal except for slightly decreased in his cervical spine.  (AR 330, 331, 332.)  Dr. Blevins assessed Plaintiff as able to occasionally lift 15 pounds, stand or walk 2 hours per day, and sit for 6 hours per day.

4

Linda Blazina, Ph.D., performed a consultative examination of Plaintiff on October 20, 1998. Dr. Blazina noted that Plaintiff's hygiene was "fair," and that he was noticeably tremulous during the evaluation. His gait was slow but he "ambulated independently." (AR 337.) He was alert and marginally cooperative. He made minimal eye contact and his mood was irritable. (AR 338.)

Dr. Blazina found his attention and concentration to be mildly impaired. Dr. Blazina found Plaintiff to be functioning in the mild mental retardation to borderline range with a limited vocabulary. He had a full scale I.Q. of 69, but "it was not clear whether [Plaintiff] gave his best effort during the testing," so it was possible that the scores underestimated his intellectual functioning to some degree, such that his actual functioning might be in the borderline range. (AR 340.) His reading was at the 8th-grade level. (AR 340.) His current GAF level was 50 to 60. (AR 341.) More specifically, Dr. Blazina found Plaintiff's ability to do work-related activities to be limited as follows:

A.  Ability to understand and remember: May be limited due to the fact that he was unable to provide information about his personal history, such as dates of employment. However, he was somewhat evasive in regard to his history and this may have contributed to his not providing information.

B.  Ability to sustain concentration and persistence: Appears to be mildly impaired due to attention and concentration problems, which may be associated with anxiety and/or depression.

C.  Social interaction abilities appear limited due to possible depressive features, as well as[ ] possible characterological traits that affect his ability to interact with other[s] appropriately.

D.  Adaptation: May be limited due to possible depressive and/or anxiety features.

(AR 341–42.)

In an RFC conducted in October 1998 (AR 343–50), consulting physician Dr. Frederic E. Cowden indicated he believed Plaintiff was able to lift 50 pounds occasionally, 25 pounds frequently, to stand and/or walk about 6 hours in an 8-hour workday and to sit about 6 hours in an 8-hour workday. His ability to push or pull was considered unlimited and no postural limitations were established. (AR 344–45.) His ability for gross manipulation with the right hand was limited, and he needed to avoid dust, fumes, poor ventilation, etc., because of his lung problems. Dr. Cowden supported his assessment by noting that Plaintiff alleged problems with emphysema, hypertension, colon problems and knee pain, along with the injury to the tendons in his right fifth finger. (AR 344–45.) Dr. Cowden felt, however, that the combined effect of Plaintiff's conditions did not

5

support the degree of disability alleged. Dr. Cowden also was working under the assumption that the finger that had been operated on would be fully functional by June 1999. (See AR 350.)

In a Psychiatric Review Technique form filled out in October 1998, the examiner concluded that an RFC was required on the basis that Plaintiff appeared to have severe impairments in several areas that did not appear to meet or equal a listed impairment. Specifically, Plaintiff was considered to be depressed and anxious, with significantly subaverage general intellectual functioning at the borderline level, and antisocial traits. He was believed to have slight restrictions in the activities of daily living, moderate difficulties in maintaining social functioning and to have frequent deficiencies of concentration, persistence or pace. (AR 358.)

Victor Pestrak, Ph.D., conducted the Mental RFC as a follow-p to the Psychiatric Review Technique. Dr. Pestrak considered Plaintiff to have moderate limitations in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and in his ability to work in coordination with or proximity to others without being distracted by them. (AR 360.) He was also considered moderately limited in his ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; in his ability to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting. (AR 361.) Dr. Pestrak nonetheless concluded that, while moderately limited, Plaintiff was nonetheless capable of performing adequately in the referenced areas, though he "should not work regularly with the public." (AR 362.)

Another RFC assessment conducted in January 1999 rated Plaintiff as capable of lifting 50 pounds occasionally, 25 pounds frequently, standing and/or walking about 6 hours in an 8-hour workday, sitting about 6 hours in an 8-hour workday, with unlimited ability to push and/or pull and no postural limitations. (AR 365–66.) He was considered to be limited only in gross and fine manipulation with his right hand (AR 367), with a need to avoid concentrated exposure to dust and fumes (AR 368).

Records from Baptist Dekalb Hospital indicate Plaintiff overdosed on anti-depressants and tranquilizers in a suicide attempt in April 1999 . After being stabilized at Baptist Dekalb, he was transferred to Centennial Medical Center (AR 372–85  ). He apparently reported upon admission that he overdosed

because he was upset with his wife. (AR 378.) Subsequently, he told an attending nurse that he had attempted suicide in order to avoid going to jail. (AR 379.)

Plaintiff's treating physician, Dr. Jerry Maynard in Woodbury, Tennessee, completed a "Medical Assessment Of Ability To Do Work-Related Activities" form dated November 22, 1999. (AR 386–90.) According to this form, Dr. Maynard found that Plaintiff's ability to lift and/or carry was impaired, and the medical findings that supported this assessment included: "COPD; osteoarthritis; HTN [hypertension]; bi-lateral carpal tunnel syndrome; fibromyalgia; tachycardia; status post trauma and surgery to left knee; back pain secondary to degenerative disc disease; chronic weakness and fatigue; objectively shown by consultative exams and reports, physical examinations and tests." (AR 386.) On that basis, Dr. Maynard believed Plaintiff could lift 10 to 15 pounds occasionally, with no frequent lifting. (AR 386.)

Dr. Maynard considered Plaintiff's ability to stand or walk to be impaired. In support of this assessment, Dr. Maynard referenced the answer to the first question, and added, "Patient complains with weakness and pain in his knees." (AR 387.) Similarly, he found Plaintiff's ability to sit to be impaired, such that he could sit for three to four hours in an eight-hour workday, but only forty-five minutes to an hour without interruption. (AR 387.) He stated Plaintiff could "rarely" climb, balance, crouch, kneel, crawl or stoop. (AR 387.) He again cited to his responses in parts I and II to support this assessment.

Dr. Maynard stated Plaintiff's ability to reach, handle and feel was limited as a result of the "neuropathy he experiences in his hands," as well as the trauma to his fingers. He had decreased vision as a result of his hypertension, and his ability to reach, push and pull was limited by his osteoarthritis and chronic back problems. Dr. Maynard also found Plaintiff to have significant environmental restrictions. (AR 388.) In the section calling for a narrative response to support that assessment, Dr. Maynard stated: "This patient has limited mobility due to his chronic fatigue and pain and should not be around heights or moving machinery. He is extremely nervous and anxious, and noise will adversely affect him. Vibration will increase his pain. Temperature extremes, chemicals, dust, fumes and humidity intolerance due to COPD." (AR 389.) Dr. Maynard added that "[t]his patient suffers from significant anxiety and depression that further limits [sic] his ability to function and cope. He also suffers from very low intellectual functioning. His prognosis is poor as the conditions from which he suffers are progressive." (AR 389.)

7

Finally, Dr. Maynard specified that the limitations noted were normally expected from the type and severity of the diagnoses in this case, that the diagnoses were confirmed by objective findings, and that his opinion was not based primarily upon Plaintiff's subject complaints.  (AR 390.)

Dr. Maynard's medical notes from December 1996 through February 1998 also reflect that Plaintiff complained of shortness of breath, back pain, leg pain, smokers cough, foot pain, hypertension, hypercholesterolemia, nerve problems as well as occasionally bronchitis and upper respiratory infection (AR 460–65.)  In December 1997 he dislocated the fifth finger of his right hand.  (AR 456.)  There is no indication that he complained consistently about his hands or was ever diagnosed with carpal tunnel syndrome.

In June 1998, the doctor noted Plaintiff had sternum tenderness of three months duration, that he was "worried & in pain," and had just had an EKG done the prior week when he went to the ER for chest pain.  He was on Accupril, Percocet, Soma, Ibuprofen, Lorazepam, and Calan.  (AR 451).

In July and again in September and October 1998, Plaintiff complained of wheezing, chest pain, chest congestion, coughing, as well as his other recurrent complaints of HTN, COPD, anxiety, back pain, degenerative disc disease.  His physician thought he might have  fibromyalgia of the anterior chest wall.  (AR 446, 447, 394)

In November 1998, his conditions were all noted to be "uncontrolled," except for the COPD, which was controlled.  He was once again strongly urged to quit smoking.  (AR 393.)  In January 4, 1999, however, his hypertension was "improved," and his other conditions were largely controlled.  Low back pain was noted to be a "chronic problem."  (AR 392.)

Dr. Maynard's last entry was for April 26, 1999, on which date he noted that Plaintiff's hypertension was uncontrolled but other conditions were controlled, including COPD, anxiety, and fibromyalgia of the anterior chest wall.  (AR 391.)  Plaintiff was complaining about hypertension, low back pain and anxiety.  He was noted to be a heavy smoker and to be disheveled and depressed in appearance.  Dr. Maynard also noted that the patient was "known to be selling some of his medication – namely Xanax & pain medication.  Refused to give him above & he stormed out angry."  (AR 391.)

The appeals council accepted some late-filed exhibits, which all post-date the ALJ's decision.  Because these medical records post-date the ALJ's decision, they cannot be considered relevant to this

8

Court's review of that decision and cannot be considered here.[3]

## B. Testimony At Hearing

### (1) Plaintiff's Testimony

At the hearing conducted on November 23, 1999, Plaintiff testified that he was 37 years old as of the date of the hearing and that he had gone to school through the 9th grade. The last time he had worked on a full-time basis was June 26, 1998, at Norvell Protective Clothing. He stated he had worked there for about a year and a half as a material spreader and cutter. The job required substantial lifting. Before that job he worked construction.

Plaintiff stated he quit working in June 1998 because he became physically unable to do the work. He claimed he could not do the walking, could not breathe because of the dust, and bending over made his blood pressure go up. (AR 47–48.) He was missing work because he would get dizzy and sick and his legs would hurt. (AR 48.)

Although Plaintiff was on disability in 1996 and 1997 for alcohol and drug dependency, he testified at the hearing that he had been sober for four years (which begs the question of why he was on disability for alcohol dependency in the interim) and that he did not use illicit drugs either. He also claimed he went back to work before his disability ceased. (AR 48–49.)

With respect to his physical problems, Plaintiff claimed he had chronic lung disease or emphysema, which caused him to have severe phlegm all the time; he wheezed constantly and used an inhaler. He had the most difficulty breathing at night and frequently uses some kind of breathing machine. The lung problems caused him to hurt around his upper back and arms, either on his chest wall or the lungs themselves. (AR 50.) He was still smoking but he was trying to quit and had cut back substantially. He testified he had tried to quit two or three times but always starts up again because of his anxiety and nerve problems, but he was

_____

[3] The Appeals Council has an obligation to review submissions, but only if the submissions constitute "new and material evidence," and only if it relates to the period on or before the date of the ALJ's hearing decision. See 20 C.F.R. § 404.970(b). "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." Cline v. Comm'r of Soc. Security, 96 F.3d 146, 148 (6th Cir. 1996) (citing Cotton v. Sullivan, 2 F.3d 692, 695–96 (6th Cir. 1993)). In this case, because the evidence in question post-dated the ALJ's decision, the Appeals Council had no obligation to review it and this Court has no authority to consider it. Plaintiff's recourse is a renewed petition for benefits based upon this later evidence.

"trying to almost stop it."  (AR 49.)  He had periods in the past when he had stopped completely.  (AR 50.)

Plaintiff also testified he had problems with his knees; he had had surgery on the left one but he claimed both hurt if he stood for long periods of time.  He claimed he could walk "as long as it's not real far," because he would get out of breath and his legs would hurt.  Sitting in a chair would help relieve his legs, but then his back would start to hurt.  (AR 51.)

He also alleged problems with his hands and fingers, specifically that they would get numb at night or while he was doing things during the day like driving a car or talking on the phone.  At night he slept with them between his legs so he would have feeling in them.  (AR 51–52.)  He also claimed his hands would "start cramping up" if he tried to use a screwdriver or similar task.  (AR 52.)  His right hand is worse than the left, in particular because he had had surgery on the right fifth finger to re-attach it, but he still could not use that finger.  He claimed both of his hands swelled but the right more than the left.  (AR 52.)  He also claimed to have been diagnosed with generalized osteoarthritis, not just in his hands.  (AR 52.)  He also claimed to have been diagnosed with carpal tunnel syndrome.  (AR 53.)  Plaintiff stated he could grip a little but that he had very little strength in his hands, and that one or two of the knuckles would swell up and bother him more than the others.  Cold weather made his hands hurt more because they were cold.  (AR 53.)

Plaintiff stated arthritis also bothers his hips, which he treated with an ointment that you rub onto the affected area.  (AR 54.)

He has had severe high blood pressure for several years, for which he took medication.  He took the medication in compliance with his doctor's orders but his blood pressure was still only marginally controlled.  He also claimed to have memory problems, which his doctors surmised resulted from years of untreated hypertension.  (AR 54–55.)

Plaintiff also claimed to have chronic diarrhea, caused by diverticulosis.  (AR 55.)  He claimed to have recently lost 20 to 25 pounds without trying as a result of his diverticulosis.  (AR 55.)

With respect to his suicide attempt from earlier in the same year (April 1999), Plaintiff claimed it was prompted by "several different things," including his family and his concern about being sick.  (AR 56.)

He discussed his anxiety attacks for which he also takes medication.  He stated that sometimes he would go for a week without one, and sometimes he would have an attack once or twice a day.  He described

10

his attacks as a feeling of being "real real nervous" and sometimes he gets short of breath. (AR 56.) However, he has never sought any mental health counseling. (AR 56–57.)

Plaintiff also claimed he had no energy level and that he is tired all the time; that his eyesight is bad and getting worse. (AR 57.)

At the time of the hearing, Plaintiff was homeless and staying with "anybody that will let [him] stay." (AR 58.) He had stayed with his mother the day before the hearing, and in his car the day before that. (AR 58.)

During the day he just sits or lies around. (AR 58.)

### *(2)* *Vocational Expert's Testimony*

Vocational Expert ("VE") Gina Klaus testified at the hearing that Plaintiff's past relevant work as a garment cutter and spreader would be classified as very heavy and semiskilled, and his work as a construction laborer would be classified as very heavy and unskilled. (AR 58–59.) The ALJ posed a hypothetical to the VE as to whether, if he found that Plaintiff retains the residual functional capacity to perform a full range of light work, would there be jobs that a person of Plaintiff's age, education, and past relevant work experience could be expected to be able to perform. The VE responded affirmatively, and listed such jobs as including cashier, small parts assembler, and miscellaneous laborer in a non-construction trade, at total of 37,500 jobs in the state of Tennessee. (AR 59.)

Alternatively, the ALJ asked, if he should find the person in question needed to have a sit-stand option, how would that affect his ability to perform any or all of these jobs. The VE responded that such a finding would reduce the jobs available by fifty percent. (AR 59.) The ALJ further narrowed the hypothetical, asking if the person could not do jobs that required repetitive gripping or grasping with his right hand, would that affect his ability to do the jobs identified. (AR 60.) At that point, the VE stated that such a restriction would eliminate the jobs she had identified. (AR 60.) However, the VE stated there would be other jobs available to a person who needed a sit-stand option and could not do repetitive gripping and grasping, including jobs as a security clerk or guard, plus a few cashiering jobs. The VE stated there were approximately 7000 such jobs in the state. Finally, the ALJ asked whether a person's ability to do those jobs would be affected if the person needed to avoid high-stress jobs, and the VE responded that it would not. (AR

11

60.)

Plaintiff's counsel asked whether Plaintiff's IQ of 69 would affect his ability to do the jobs identified, and the VE responded that it should not. (AR 60–61.) However, if Plaintiff's testimony that he need to lie down to rest during the day were fully credited, he would not be able to perform any of the jobs identified. (AR 61.)

III.    **ALJ'S DECISION**

The ALJ noted that Plaintiff claimed disability beginning June 26, 1998 due to alleged problems with high blood pressure, emphysema, nerves, colon, bilateral carpal tunnel syndrome, and bilateral knee pain. (AR 23.) After reviewing the medical testimony, the ALJ concluded that the evidence supported a finding that Plaintiff was status-post surgery on his right 5th finger, had borderline intellectual functioning and COPD, impairments that the ALJ found to be severe within the meaning of the regulations but not severe enough to meet or equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

The ALJ noted that he was required, in making his assessment, to consider all symptoms, including allegations of pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Ruling 96-7p. The ALJ observed as well that he was required to consider any medical opinions that reflect judgments about the nature and severity of the Plaintiff's impairments and resulting limitations. (AR 31, citing 20 C.F.R. §§ 404.1527 & 416.927, and Soc. Sec. R. 96-2p & 96-6p.)

In light of those requirements, the ALJ opined that Plaintiff's complaints of hand pain and weakness "are not supported to the extent that the claimant would be unable to lift at least 20 pounds and perform both fine and gross dexterous movements." (AR 31–32.) Dr. Arms, who performed the surgery on Plaintiff's finger, placed no restrictions on Plaintiff's ability to perform work-related activities, and Dr. Arms had not seen the Plaintiff for any problems associated with the surgery or any complications following the surgery on his right hand.

With respect to his alleged carpal tunnel, the ALJ noted that there was no evidence or diagnostic testing in the record suggesting the claimant had any problems with his left hand, nor had any specialist diagnosed carpal tunnel. Dr. Blevins noted no swelling in the upper or lower extremities and, while there were

12

signs consistent with osteoarthritis, this was not confirmed by laboratory tests. There was no objective evidence of continued treatment for knee pain except for routine medication. Plaintiff continued to use cigarettes despite complaints of shortness of breath and fatigue. The ALJ stated: "The claimant's continued use of cigarettes, despite his chronic pulmonary disease and against the advice of his doctor, may be viewed as an indication that the claimant's condition is not as disabling as purported. A person with severe pulmonary problems would presumably have a limited ability and desire to continue smoking." (AR 32.) As of the date of the ALJ's decision, Plaintiff had not had an MRI, and an x-ray of his spine showed only slight disc-space narrowing at L5-S1. Further, Plaintiff had received only routine care from a family practitioner and had not been seen by any specialist for complications related to his COPD, knee pain, back pain or hand pain.

The ALJ specifically stated that he rejected Dr. Maynard's opinion on the basis that Dr. Maynard only repeated Plaintiff's subjective allegations as his diagnosis and had not confirmed his opinion by his own treating notes or by diagnostic testing. The ALJ noted that Plaintiff was non-compliant with prescribed medication and that Dr. Maynard noted on one occasion that Plaintiff was known to be selling his medication. "It is evident," said the ALJ, "that if the claimant had been taking his medication he would not have had ample quantities for sell [sic]." (AR 32.) The fact that Plaintiff's suicide "gesture" by drug overdoes in 1998 in an attempt, by his own admission, to avoid going to jail, did not enhance the ALJ's opinion of him or his credibility. (See AR 30–31.)

The ALJ further noted that Dr. Maynard had not recommended nerve conduction or other studies to confirm a diagnosis of carpal tunnel and the consulting physician, Dr. Blevins, noted that Plaintiff had full range of motion in his left wrist. (AR 32.) Further, Dr. Blevins' range-of-motion studies elsewhere indicated only a 10% loss of extension in the cervical spine, a 15% loss in the right lateral flexion, and a 10% loss in left lateral extension. The ALJ found no objective evidence of colon problems or diverticulitis, nor evidence of arthritis in his hips, poor eyesight, or significant mental problems. The Plaintiff "reportedly wears corrective lenses when he chooses to do so." (AR 32.)

The ALJ further stated:

The claimant has testified he is incapacitated by pain and mental distress and that he cannot perform and sustained work activity at any exertional level. In terms of daily living, the claimant testified that he does not do anything. He reported he is able to dress, bathe and feed himself, and can drive when he chooses. He can walk without an assistive device and

13

has no difficulty speaking or understanding speech. He maintains a marital relationship with his wife and lives with his father. He reported he does not socialize. Although his IQ scores are questionable at the borderline [level of] intellectual functioning, there is no evidence of a severe impairment in adaptive functioning due to low intellectual functioning. The evidence as a whole does not substantiate any good cause for the claimant's isolation and inactivity, apart from him own preference. The undersigned must conclude, based upon a consideration of the subjective allegations weighed against objective medical evidence and other relevant information bearing on the issue of credibility that the claimant exaggerates his physical and mental complications and so such subjective allegations must be rejected as lacking total credibility.

(AR 32–33.) On that basis, the ALJ determined that the Plaintiff retained the capacity to perform light exertional activities on a sustained basis and that he suffered no more than mild to moderate pain, which would interfere with his ability to concentrate.

Because a vocational expert testified at the hearing that Plaintiff's past work was all characterized as heavy and semi-skilled, the ALJ found that Plaintiff is not capable of performing any of his past work. The burden therefore shifted to the Commissioner to demonstrate that there are a significant number of other jobs in the national economy that the Plaintiff could perform consistent with his medically determinable impairments, functional restrictions, age, education and past work experience.

Considering the grid, the ALJ classified Plaintiff as a younger individual with a limited education and no transferable skills, able to perform "a significant range" of light work, as defined in 20 C.F.R. §§ 404.1567 and 416.967, but not a "full range." (JA 34.) The ALJ noted that If Plaintiff were able to perform a full range of light work, a finding of "not disabled" would be directed by the Medical-Vocational Guidelines. (Id.) The ALJ further noted that where a claimant's ability to perform light work is impeded by additional exertional or nonexertional limitations, an impartial vocational expert may be used to help determine whether there is a significant number of jobs in the national economy that the claimant can perform given his specific residual functional capacity and other vocational factors.

Thus, the ALJ took into account the VE's response to the ALJ's hypothetical incorporating reference to Plaintiff's age, educational background, work experience and residual functional capacity, and found that there was a significant number of jobs in the national economy that Plaintiff could perform, including work as a cashier; small parts assembler; miscellaneous laborer in non-construction. The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act at any time through the date of the decision.

**IV.    PLAINTIFF'S STATEMENT OF ERRORS**

Plaintiff filed this action challenging the ALJ's finding that he was not disabled. Specifically, Plaintiff raises the following claims:

(1) That the ALJ erred in finding that the plaintiff had the residual functional capacity to perform a significant range of light work.

(2) That the ALJ erred in failing to consider the combined effect of Plaintiff's multiple impairments.

(3) That the ALJ erred in applying the grid regulations to reach a decision.

(4) That the ALJ erred in rejecting the opinions of the doctor performing the consultative exam and the plaintiff's treating physician.

(5) That the ALJ erred in failing to find that the Plaintiff met the requirements of Listing 12.05C.

(6) That the ALJ erred in failing properly to evaluate Plaintiff's allegations of pain.

(7) That the ALJ erred in not finding Plaintiff's testimony to be fully credible.

(8) That the ALJ erred in stating "A person with severe pulmonary problems would presumably have a limited ability and desire to continue smoking."

(9) That the ALJ erred in finding that a significant number of jobs existed in the regional economy that Plaintiff could perform.

Each of these contentions is addressed below.

## V.  ANALYSIS AND DISCUSSION

### A.  Standard of Review

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. The ALJ's decision, If the Appeals Council denies review or affirms the ALJ's decision, the ALJ's decision becomes the final decision of the Commissioner. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. See Abbott v. Sullivan, 905 F.2d 918, 922 (6th Cir. 1990). If substantial evidence supports the ALJ's conclusion, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. Youghiogheny & Ohio Coal Co. v. Webb, 49 F.3d 244, 246 (6th Cir. 1995). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. See Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality is based upon the record taken as a whole.

See Houston v. Sec'y of Health & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984).

**B.    Evaluation Of Entitlement To Social Security Benefits**

Under the Social Security Act (the "Act"), Plaintiff is entitled to receive benefits only if he is deemed "disabled."  42 U.S.C. § 423(d)(1)(A).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process.  See 20 C.F.R. §§ 404.1520 and 406.920.  An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits.  See id.  The Sixth Circuit has summarized the steps of this "Sequential Evaluation" as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

See Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f).  The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity.  See Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

**C.    Plaintiff's Claims of Error**

*(1)    Whether the ALJ erred in finding that Plaintiff had the residual functional capacity to perform a significant range of light work.*

16

The VE testified that, assuming the claimant had the abilities and limitations set forth in the ALJ's hypothetical question, Plaintiff could perform the jobs of cashier, small parts assembler, and miscellaneous laborer (non-construction). (JA 59.) Plaintiff claims the ALJ erred when he found that there were 37,500 of each of the jobs identified by the VE. Plaintiff is correct insofar as the VE testified that there was a total of 37,500 jobs in Tennessee in those areas, and the ALJ appeared to have construed the ALJ's testimony to mean there were 37,500 of each of the different jobs. (See AR 34.) However, 37,500 jobs is still a significant number. See, e.g., Born v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1174–75 (6th Cir. 2000) (500 jobs in the regional economy was a significant number); Hall v. Bowen, 837 F.2d 272, 274–75 (6th Cir. 1988) (1350 jobs held to represent a "significant number").

Plaintiff also appears to be arguing that the ALJ implicitly found Plaintiff unable to perform a full range of light work, and thus that the ALJ erred in finding there was a significant number of jobs in the economy that he could perform, given the VE's testimony that the number of available jobs would be cut in half if Plaintiff required a sit/stand option, and that there would be no available jobs if, on top of that, Plaintiff was restricted from performing jobs that required repetitive gripping or grasping with his right hand.

Plaintiff is correct that the ALJ found Plaintiff unable to perform a full range of light work. However, as the Commissioner points out, the ALJ did not expressly find that Plaintiff was limited to jobs that required a sit/stand option or no repetitive gripping or grasping. Instead, he found that Plaintiff's exertional abilities at the light level were limited only by "mild to moderate pain which would interfere with his ability to concentrate." (AR 35, "Findings.") Even if he had found that Plaintiff required a sit-stand option, the VE testified that there was a significant number of jobs in the economy that would permit that option or that did not require repetitive gripping or grasping. (AR 60.) Thus, given the evidence in the record and the ALJ's specific findings, the ALJ did not err in concluding Plaintiff was capable of performing a significant range of light work and that there was a significant number of jobs in the local economy that Plaintiff could perform given his specific abilities and limitations.

> **(2)** **Whether the ALJ erred in failing to consider the combined effect of Plaintiff's multiple impairments.**

Undoubtedly, the ALJ is to consider the combined effects of the Plaintiff's multiple impairments in reaching a determination of disability. Barney v. Sec'y of Health & Human Servs., 743 F.2d 448, 553 (6th Cir.

1984).  Plaintiff argues that it is improper for the ALJ to "selectively choose the evidence from the claimant's presentation which buttresses the opinion of the ALJ and to ignore that evidence which indicates a substantial disability." (Doc. No. 8, at 9.)  More specifically, Plaintiff seems to be arguing that the ALJ failed to take into consideration the evidence demonstrating that Plaintiff had a long history of anxiety and depression, which culminated in a suicide attempt in 1999, and that he functioned at the borderline intellectual level.  Plaintiff contests in particular the ALJ's apparent discounting of Plaintiff's suicide attempt as a "suicide gesture" made, by Plaintiff's own admission to a nurse at the hospital, to avoid going to jail. (AR 379.) As Plaintiff points out, the same medical record also notes, "took meds because he was upset with his wife." (AR 378.)  At the hearing, Plaintiff related the suicide attempt to "family" issues and to his being upset about being sick.  (JA 56.)

Plaintiff's contention of error is without merit.  At Step Two of the Sequential Evaluation, the ALJ found Plaintiff had impairments that were severe within the meaning of the regulations, including damage to his right fifth finger, borderline intellectual functioning, and COPD.  He also found that Plaintiff had limited education and no transferable skills, and further noted that Dr. Blazina had assessed Plaintiff as "experiencing possibly mild features of anxiety and/or depression." (AR 29.)  The ALJ clearly did not credit Plaintiff as suffering from the degree of anxiety and depression that Plaintiff contends.  The credibility issue is discussed below in connection with Plaintiff's seventh statement of error.  Otherwise, the ALJ's decision to discount Plaintiff's allegations of anxiety/depression is supported by substantial evidence in the record as a whole.  In particular, the record indicates Plaintiff took medication for his anxiety and that the medication controlled the condition. It is axiomatic that a medical condition that is controlled by medication is not disabling.  Henry v. Gardner, 381 F.2d 191, 195 (6th Cir.), cert. denied, 389 U.S. 993 (1967).

In sum, Plaintiff does not indicate any specific basis for concluding the ALJ failed to consider his impairments in combination, and the ALJ's opinion as a whole in fact indicates that he did consider all of Plaintiff's alleged impairments.

### (3)    Whether the ALJ erred in applying the grid regulations to reach a decision.

Contrary to Plaintiff's assertion, the ALJ did not use the grid to reach a finding of no disability. Instead, he clearly stated that if Plaintiff were found able to perform a full range of light work, then the grid

18

would dictate a finding of no disability. However, because he found that Plaintiff had functional limitations that did not permit him to perform a full range of light work, the ALJ took into account the testimony of the VE who testified that there was a significant number of jobs in the national economy that a person with Plaintiff's specific residual functional capacity, age, education and skill level could perform. On that basis, the ALJ reached a finding of no disability under Step Five of the Sequential Evaluation. The claim of error based upon the ALJ's supposed use of the grid is meritless.

### (4) Whether the ALJ erred in rejecting the opinions of the doctor performing the consultative exam and the plaintiff's treating physician.

The law is clear that when a treating source's medical opinion is well supported and not inconsistent with other substantial evidence in the record, it must be given controlling weight. Plaintiff contends the ALJ erred in failing to give controlling weight to the opinion of Dr. Maynard, who treated Plaintiff beginning in 1992 (and apparently ceased treating him after he found Plaintiff was selling his pain medication).

Notwithstanding, as the Commissioner points out, the ALJ discussed the weight he gave to various medical opinions and gave reasons for his decision not to fully credit the opinion of Dr. Maynard. First, he noted that Plaintiff had received only routine treatment from his family practitioner, and there was no indication he had ever been referred to or treated by a specialist for advanced complications relating to his COPD, knee pain, back pain or hand pain. (AR 32.) The ALJ also observed that Dr. Maynard listed Plaintiff's subjective allegations as his diagnosis without confirming his opinion in his own treatment notes or with any diagnostic testing. Cf. Duncan v. Secretary of Health & Human Services, 801 F.2d 847, 855 (6th Cir. 1986) ("[T]he ultimate determination of disability rests with the Secretary, not with the treating physician. Accordingly, the Secretary is not bound by a treating physician's conclusory statement.") (citations omitted). Finally, Dr. Maynard found that Plaintiff had not complied with prescribed medication as evidenced by the fact that he apparently was selling some of his pain medication. (AR 32.) A claimant must comply with prescribed treatment to be found eligible for disability benefits under the Act. 20 C.F.R. § 404.1530; Hull-Thulin v. Comm'r of Soc. Security, 110 F.3d 64, 1997 WL 144237, at *1 (6th Cir. Mar. 27, 1997).

The ALJ did not err in partially rejecting the conclusion of Dr. Maynard.

### (5) Whether the ALJ erred in failing to find that the Plaintiff met the requirements of Listing 12.05C.

Listing 12.05C states: "A valid verbal, performance, or full scale IQ of 60 to 70 inclusive and a physical or other mental impairment imposing additional and significant work-related limitation of function." Plaintiff argues that he has a full-scale IQ of 69 and numerous other functional limitations, and that the ALJ erred in failing to find that he met Listing 12.05C.

This contention, too, is without merit. The ALJ found that Plaintiff had borderline intellectual functioning rather than mental retardation, which, as the Commissioner argues, "is the hallmark of Listing 12.05." (Doc. No. 13, at 10.) Substantial evidence in the record supports this finding, including that Dr. Blazina found Plaintiff to be only "marginally cooperative," that it was possible his scores underestimated his actual ability, and that he appeared to be functioning in the borderline range. (AR 340.) An earlier examination noted Plaintiff appeared to be functioning in "at least the borderline intellectual range if not higher." (AR 222.) The ALJ did not err in finding that Plaintiff did not meet his burden of establishing that he met the elements of a listed impairment.

> **(6)** **Whether the ALJ erred in not finding Plaintiff's allegations of pain and other subjective symptoms to be fully credible.**

In his opinion, the ALJ noted that he was required to consider Plaintiff's subjective symptoms, including pain. He then went on to discuss various factors that reduced Plaintiff's credibility: (1) the medical evidence suggested that Plaintiff's conditions were not as severe as he alleged; (2) Plaintiff continued smoking cigarettes despite being told directly by numerous medical practitioners to quit and despite the fact that he had breathing problems; (3) evidence in the record that he consumed alcohol despite his testimony to the contrary; (4) non-compliance with prescribed medication, including allegedly selling pain medication; and (5) Plaintiff seemed to have no problem taking care of his personal needs and he drove when he chose to. The ALJ's credibility analysis was proper under Duncan v. Secretary of Health & Human Services, 801 F.2d 847 (6th Cir. 1986). **[DO I NEED TO ELABORATE ON DUNCAN?]** _NO_

> **(7)** **Whether the ALJ erred in stating "A person with severe pulmonary problems would presumably have a limited ability and desire to continue smoking."**

While it is demonstrably true, as Plaintiff argues, that quitting cigarette smoking is very difficult, it simply cannot be said that the ALJ erred in considering Plaintiff's failure to quit smoking. See 20 C.F.R. § 404.1530(a) (in order to get benefits, a claimant must follow the treatment prescribed by the claimant's

physician); <u>Sias v. Sec'y of Health & Human Servs.</u>, 861 F.2d 475, 480 (6th Cir. 1988) (finding that the claimant's failure to lose weight and stop smoking was "not consistent with [the life-style] of a person who suffers from intractable pain"); <u>Henry v. Gardner</u>, 381 F.2d 191, 195 (6th Cir.), <u>cert. denied</u>, 389 U.S. 993 (1967) (an impairment that can be remedied by treatment will not serve as a basis for a finding of disability).

> ***(8)      Whether the ALJ erred in finding that a significant number of jobs existed in the regional economy that Plaintiff could perform.***

Plaintiff's final statement of error rehashes many of his other arguments. In addition, Plaintiff adds the contention that the fact that he would have to travel a minimum of 35 to 40 miles each way to get to a job militates against a finding that there are jobs in the economy he can perform. Notwithstanding, Plaintiff testified that he was able to drive. Moreover, the relevant statute and regulations do not authorize consideration of whether a Plaintiff lives in a remote areas. <u>See</u> 42 U.S.C. § 423(d)(2)(A) (prohibiting consideration of whether the work in question "exists in the immediate area in which [the claimaint] lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work"); 20 C.F.R. § 404.1566(a) (same). This contention is likewise without merit.

## VI.      CONCLUSION

For all the reasons set forth above, this Court finds that the administrative record contains substantial evidence to support the ALJ's conclusion that Plaintiff had the residual capacity to perform a significant range of light work and therefore was not disabled within the meaning of the Act. The Commissioner's decision denying benefits will be affirmed. An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge

21